Filed 12/17/20  P. v. Weece CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>          v.<br><br>JOHN EDWARD WEECE,<br><br>    Defendant and Appellant. | F077362<br><br>(Super. Ct. No. VCF353288)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County.  Joseph A. Kalashian, Judge.[*]

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Jennifer M. Poe, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]Retired Judge of the Tulare Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

## INTRODUCTION

A jury convicted defendant John Edward Weece of multiple counts of sexual abuse of female minors, including three counts of sex with a child 10 years or younger, nine counts of oral copulation/penetration with a child under 10, 32 counts of forcible lewd acts on a child, two counts of lewd acts on a child, and one count of using a minor for sexual acts. (Pen. Code, §§ 288, 288.7, 311.4.) On appeal, he argues insufficient evidence supports his convictions. He further contends the court erred in admitting an out-of-court interview with the youngest complainant; the prosecutor committed numerous instances of prejudicial misconduct; and the court prejudicially erred in failing to instruct the jury it could not convict him of any of the charged offenses based upon uncharged acts evidence (CALCRIM No. 1191A).

We affirm defendant's convictions.

## FACTUAL BACKGROUND

Defendant was charged with 53 counts of sexual abuse.

### *Prosecution case*

#### Initial disclosure

At trial, Doe 1 testified that, in February 2016, she watched a presentation at school that discussed abuse, child pornography, and inappropriate touching. The presenters explained a person could go to jail for having naked pictures of a child.

Doe 1 recalled an incident when defendant forced her to take inappropriate pictures of her sister, Doe 2, when she was nine years old. They were in defendant's shop behind his house and defendant told Doe 2 to take off her clothes; she undressed from the waist down. Defendant gave Doe 2 a vibrator and told Doe 1 to use his phone to take pictures of Doe 2 with the vibrator in her vagina. Defendant then deleted the pictures off his phone. Defendant never touched Doe 1, but she had seen him touching Doe 2 on her thighs over her clothes.

After the school presentation, Doe 1 got scared and stressed out; she could not eat. In the evening of February 11, 2016, Doe 1 told her mother, Ms. D., she was not feeling well. Doe 1 was pale and running a fever. That night, she eventually disclosed to her mother the incident when defendant forced her take pictures of Doe 2 "'doing bad things.'" Ms. D. called her sister, Ms. M., who had a young daughter, Doe 3; Ms. D. explained what Doe 1 had told her. The next day, Ms. D., Ms. M., and Doe 1 spoke to Doe 2 while Doe 3 was in another room.

Ms. D. asked Doe 2 if anyone had ever touched her. Doe 1 was crying, and Doe 2 started crying. Doe 2 initially said no, but she eventually admitted defendant had touched her inappropriately. Ms. M. asked Doe 2 if Doe 3 should be left alone with defendant, and Doe 2 said no.

Ms. M. then went to speak to Doe 3 in another room. She asked Doe 3 if anyone had ever made her feel uncomfortable or touched her inappropriately. Doe 3 told her something happened with defendant that should not have happened. Ms. M. called the police and Detective Florence Cotton arrived and took over the investigation.

Ms. M. also called defendant's wife and told her to come to Ms. D.'s house and said it was about defendant and the girls. According to defendant's wife, she felt like she was going to have a heart attack; she understood Ms. M.'s statement to mean something inappropriate had happened. When defendant's wife arrived at Ms. D.'s house, a police officer was there, and Doe 2 was at the table. Defendant's wife asked Doe 2 if defendant had touched her inappropriately and Doe 2 started crying.

Detective Cotton spoke to Ms. D., Ms. M., and Doe 2. She prepared a report in which she documented what Doe 2 told her. She did not speak to eight-year-old Doe 3 because, given Doe 3's age, Detective Cotton thought it best for her to speak to a forensic interviewer. Detective Cotton told Ms. M. she would be contacting her to set up an interview with the child abuse response team (a CART interview).

3.

Defendant's wife later spoke with Detective Cotton and, in response to questioning by Detective Cotton, defendant's wife reported she had a red vibrator. Defendant's wife then went back to her house. Defendant was working in Fresno that day, so he was not at home. Defendant's wife picked up her clothes, makeup bag, and $25,000 from their fire safe. She testified she initially planned to only take half of the money, but Ms. M. advised her not to leave it because defendant's wife would need it. Defendant's wife put the money in a bank account; defendant closed their other accounts. Four days later, defendant's wife called a lawyer because she was not going to "be married to somebody that had done something like that."

**Doe 2's reports of abuse**

At trial, Doe 2 testified defendant would touch and squeeze her breasts and had put his hands down her pants and touched her vagina more than five times. He touched her for the first time when she was nine years old. When Doe 2 was approximately 10 years old, she, Doe 1, and their mother lived with defendant and his wife while their house was under construction.

Doe 2 recalled an instance when defendant touched her vagina over her clothes when she and Doe 1 were wrestling with him. She specifically recalled more than once that she and defendant "would go to Lowe's [or Home Depot]; and on [their] way back, he would pull over by a dirt bike track and [digitally penetrate her vagina] while he masturbated." She remembered an incident when she and Doe 1 stayed with defendant while their mother and defendant's wife were on a trip to Arizona. According to Doe 2, defendant watched her take a shower and then asked her to dance naked for him. He also asked her to lay in his bed and he digitally penetrated her vagina while masturbating; then he inserted his penis in her vagina. Doe 2 testified most of the touching occurred when she was nine and 10 years old and she believed the touching stopped when she was a freshman in high school. She recalled an instance when defendant had a jobsite near Los

4.

Angeles and she went with him; they were on their way back when defendant pulled over, pulled her pants down, and touched her while he masturbated. She also recalled instances when defendant would rub her thigh.

**Doe 3's reports of abuse**

Doe 3's first CART interview occurred on February 17, 2016, five days after her initial disclosure. The prosecutor played the first CART interview for the jury.

A few months later, in May 2016, Ms. M. contacted Detective Cotton because Doe 3 had additional information to disclose. Detective Cotton contacted Doe 3 for a follow-up interview on May 13, 2016. Doe 3 reported to Detective Cotton that she had a conversation with her mother that triggered her memory regarding approximately five times when defendant put his hand down her pants and he digitally penetrated her. Doe 3 also reported defendant grabbed her hand and forced it on his penis three or four times. She recalled that defendant forced her mouth on his "private" at the shop at least three times; she had not previously reported this. One time, Doe 3 bit defendant and he got upset and did not speak to her for the rest of the day. In one incident while defendant's penis was in her mouth, a white fluid came into Doe 3's mouth while defendant's eyes rolled back. Doe 3 reported that, three or four weeks before her initial disclosure, she was at defendant's shop with defendant and his wife when his wife left to go to the store. Doe 3 had to stay back with defendant, and he pulled down her shorts and began licking her "pussy." She had scratches from defendant pulling her pants down and bruises on her inner thighs. Doe 3 drew a picture of defendant's penis that day with two scars on it.

A year later, in May 2017, there was an incident at Doe 3's school that caused Ms. M. to contact law enforcement again and take Doe 3 in for an additional interview. An additional CART interview was conducted on June 7, 2017, and investigator Khoua Lopez observed the interview from another room. The prosecutor played a video of the second CART interview for the jury.

At trial, Doe 3 was 10 years old and in the fifth grade. She testified she had known defendant since she was very young and would spend time with him and his wife when she went to their house. Doe 3 would go to the shop of defendant and his wife after school almost every day and then go to their house until Ms. M. got off work. Doe 3 testified she enjoyed spending time with defendant. He would buy her candy and sodas and once bought her a teddy bear. Doe 3 used to consider defendant one of her best friends, but now she hated him.

She recalled that on February 12, 2016, she was at Ms. D.'s house when she was asked to go in the bedroom and watch television. Her mom then came into the bedroom and asked Doe 3 if anyone had ever touched her. Doe 3 said "no." Her "heart dropped to [her] stomach, because [she] knew someone said something." Doe 3 then told her mom defendant had "touched [her] on [her] privates in the wrong way." According to Doe 3, "everyone was … telling their parents about what happened to them" so she "just told them what happened to [her]." Ms. M. did not ask her for specific details; instead, Ms. M. said "okay" and walked out of the room. The police arrived, but Doe 3 did not speak to them that day.

Doe 3 remembered the first CART interview when she was asked questions regarding what had happened to her, but Doe 3 did not tell everything that had happened because she was embarrassed. It was the first time Doe 3 had talked to anybody about details regarding what had happened with defendant. Doe 3 later spoke with Detective Cotton regarding what had happened with defendant.

Doe 3 testified she did not recall the first time that defendant touched her, but she believed it occurred when she was five or six years old. The first incident she remembered was defendant telling her that if she let him take pictures of her on the beach, he would buy her a swimsuit. He bought her a two-piece swimsuit and then took pictures of her on the beach. At trial, the prosecutor introduced photographs of Doe 3 from that day at the beach.

6.

According to Doe 3, defendant touched her vagina with his hand between five and 10 times; some of those times he would put his fingers inside her vagina and move them up and down. Doe 3 testified defendant's penis touched her vagina and went inside. Defendant would also pull off her clothes and touch his penis to her bottom; sometimes she had underwear on, other times she did not. Doe 3 stated it was "very uncomfortable" and she asked him to stop, but he would not. This occurred more than three times but less than 10 times. The touching occurred both in the house of defendant and his wife and in their shop, but it usually occurred in the bedroom when defendant's wife was in the shower or not home. Doe 3 did not tell defendant's wife because she was nervous.

Doe 3 also testified defendant's genitals touched her mouth more than three times. He touched her breasts with his hands and mouth both over and under her clothes more than five times. He touched and squeezed her "butt" more than five times. He also put his mouth to Doe 3's private part more than three times. She recalled incidents when she saw white stuff come out of defendant's private part onto her stomach. Doe 3 testified defendant's private part touched her stomach more than three times. She also stated he kissed her on the lips multiple times. Ms. M. had seen defendant kiss Doe 3 on the lips in the past and it made her uncomfortable and she thought it was inappropriate.

Defendant told Doe 3 not to tell anyone about the touching or he would "'get in really big trouble'" and "be really mad at [her]." He also threatened to hurt her family.

Doe 3 recalled a specific incident when she drove with defendant and his wife to a national park to see a big tree. They stopped at a rest stop so defendant's wife could use the restroom. While defendant's wife was inside, defendant unzipped his pants and grabbed Doe 3's hand and put it on his penis.

She recalled another incident when she was about six years old and she and defendant dropped off defendant's wife at the airport. Defendant reached over and touched Doe 3's genital area over her clothes. She told him to stop, but he would not. He would get "real mad" at her when she told him to stop.

7.

The last time Doe 3 recalled something occurring, she and her cousin Doe 2 were at defendant's house; it was the night before she told her mother about the touching. Defendant took Doe 3 outside to look at some cars in back of the house, and he forced her to put her hand on his penis. She pulled away.

**Defendant's wife's testimony**

Defendant's wife also testified at trial. She explained she and defendant got married in 2001. They opened a business together. They eventually sold the business; "it was getting rough right before [they] sold it." After a certain period of time, the buyers of the company defaulted on their note, and defendant and his wife repurchased the business. Starting the business again caused defendant's wife some concern because she was worried about losing money. At that same time, defendant's son and his wife began living with defendant and his wife. It was apparent to defendant's wife that defendant's son and his wife did drugs.

Defendant's wife testified she babysat Doe 3 before Doe 3 was old enough to go to school. When Doe 3 started going to school, defendant or his wife would often pick her up and take her to their shop and then to their house. Defendant's wife would leave Doe 3 alone with defendant at times. She never noticed anything inappropriate or unusual between defendant and Doe 3.

Defense counsel asked whether defendant "had a problem and could not get an erection" about the time the abuse was reported; defendant's wife responded she did not know. Defense counsel then asked, "[I]s it not true that you were not having [a] sexual relationship with your husband, vaginal intercourse, because he could not get an erection?" Defendant's wife responded, "No, that's not true. That's not true."

Defendant's wife denied telling defendant's siblings or stating in front of them that "if they wanted to gain some kind of an advantage when there's a dispute, that all you had to do was allege that there was a sexual molestation taking place."

*Defense case*

Defendant testified on his own behalf. He denied all of the allegations of sexual misconduct. Defendant testified Ms. D's daughters Doe 1 and Doe 2 lived with him and his wife for some time while their house was under construction. Defendant admitted he had a black flip phone. He denied asking Doe 2 to lay naked on a carpet in the shop when she and her sister lived with him or asking Doe 1 to take photographs of Doe 2. He also denied having Doe 2 use a vibrator on herself. Defendant recalled wrestling with Doe 1 and Doe 2 in the living room when they first moved in, but he denied grabbing Doe 2's vagina. He denied watching Doe 2 take a shower at any time, pulling her towel off, making her dance naked, or touching her breasts or vagina after she showered. One time, he heard Doe 2 scream and she ran out of the bathroom naked saying there was a wasp in the shower; that was the only time defendant saw Doe 2 naked. He recalled taking a trip to the Los Angeles area for work and that Doe 2 asked to go with him, so he took her along. He denied pulling off the road and touching her inappropriately during that trip. He testified Doe 2 went with him everywhere; but he denied ever touching her vagina while they were in the car. He recalled a time his wife went to Arizona with Ms. D.; he testified Doe 1 and Doe 2 asked to stay with him, he was not trying to get them to stay with him. He denied putting his penis inside Doe 2's vagina in his bedroom or asking her to use a vibrator on herself when the girls stayed with him. He also denied masturbating in front of Doe 2 or seeing her naked during that time.

Defendant also denied touching Doe 3's vagina or butt with his mouth, hand, or penis at the shop or in the house. He further denied grabbing Doe 3's hand and placing it on his penis or forcing her to touch his penis with her mouth. He recalled taking Doe 3 places in his vehicle, but he denied he ever touched her vagina or put his penis in or near her vagina while in his truck. He also denied threatening Doe 3. According to defendant, Doe 3 was his best friend besides his wife. He recalled going on trips to a national park and to Las Vegas with his wife and Doe 3, but he denied touching Doe 3's vagina or

9.

having Doe 3 touch his penis while his wife was in the bathroom on either trip. He remembered taking Doe 3 to Pismo Beach while on a work trip and buying her a bathing suit at Kmart. According to defendant, Doe 3 changed in the bathroom at the beach and asked defendant to take photographs of her to send to her mother.

Defendant explained that he purchased a company in 2003 and his wife began working for the company with him. In 2006, defendant sold the business. In 2013, defendant took the company back after the buyers defaulted on their payments; his wife was not happy about him taking the company back.

On February 11, 2016, defendant made an offer to buy the building where his shop was located. He planned to place a $100,000 down payment, which he had in a safe at his house. His wife was present when he made the offer. He saw his wife make a phone call immediately after he had the discussion about purchasing the building. Doe 3 was at the office and asked defendant if she could stay the night; defendant said yes. Doe 2 later asked to stay the night, so defendant, his wife, and Doe 3 went to pick her up. The next morning, defendant went to work around 5:00 a.m. His wife normally arrived between 6:30 and 6:45 a.m. but she arrived a little after 7:00 a.m. that day. He sensed something was different; his wife had not done her hair or makeup. Defendant left for Fresno. On the drive, his wife called him and told him she was leaving the office to go home. On his way back to Tulare, defendant called and texted his wife, but she did not respond. He went to the house and the shop to look for her, but she was not at either. He became concerned and went back to the house. He checked the box where the money had been and realized it was empty.

According to defendant, there was supposed to be $126,000 in the house. Defendant started feeling sick and finally got a hold of Ms. M. Ms. M. told defendant his wife was having a nervous breakdown and did not want to speak to him. Defendant continued to try to reach his wife but to no avail. He heard from his son there were

10.

allegations of sexual molestation against him. Defendant was arrested on February 20, 2016.

An employee of defendant's company, Ricky H., testified he worked at the shop of defendant and his wife five days a week, and he recalled Doe 3 coming to the business regularly in 2015 and 2016. While working at the shop, Ricky could see inside the shop's office, where Doe 3 would stay when she was there. Ricky never saw defendant take off Doe 3's clothes or touch her inappropriately.

Defendant's former sister-in-law, Jan, testified she knew defendant's wife before she married defendant. Jan recalled attending a dinner with defendant's wife in 1982 when defendant's wife stated, if her daughter's biological father opposed her husband's adoption of that daughter, defendant's wife would claim the biological father had molested the daughter.

Defendant's brother, Doyle, testified defendant was previously married to the mother of Doyle's biological daughter. Doyle recalled an incident in 1988 when defendant's wife suggested to Doyle that he accuse defendant of child molestation in order to obtain visitation rights of his daughter.

## Verdict

The jury convicted defendant of all the charges alleged to have been committed against Doe 3, counts 1–41. The jury also convicted defendant of committing count 46 against Doe 2, which related to the incident during which defendant had Doe 2 use a vibrator while Doe 1 took pictures. Additionally, in relation to that incident, the jury convicted defendant of count 53, using a minor for sex acts, related to Doe 1. Finally, the jury convicted defendant of count 52 for touching Doe 2's thigh. The jury acquitted defendant of counts 42–45 and counts 47–51, which related to certain other acts alleged to have been committed against Doe 2.

## DISCUSSION

### I. Court Did Not Err in Admitting Doe 3's CART Interviews

Defendant first contends the court prejudicially erred in admitting the recordings of Doe 3's two CART interviews because they did not bear sufficient indicia of reliability. We disagree.

#### A. Relevant Procedural History

Before trial, the prosecutor moved in limine to admit the CART interviews conducted with Doe 3 on February 17, 2016, and June 7, 2017, pursuant to Evidence Code section 1360.

##### 1. February 2016 CART interview

Doe 3 was eight years old during the first CART interview. At the beginning of the interview, the forensic investigator, Laura Boland, explained to Doe 3 that if Doe 3 did not understand a question, she should let Boland know. Boland then asked Doe 3, "[S]o, what if I ask you, what gender are you, what would you say?" Doe 3 responded, "I don't know what gender means." Boland also asked Doe 3 to correct her if she said something wrong. Boland then asked Doe 3, "[W]hat if I said that you are 30 years old, what would you say?" Doe 3 responded, "That's wrong, I'm eight." Boland explained she wanted Doe 3 to tell the truth.

Boland then asked Doe 3 what they were there to talk about, and Doe 3 responded, "Family issues." Boland asked Doe 3 what Doe 3 could tell her and Boland explained it was "really important" for her to know everything that happened. Doe 3 initially stated, "[I]t was just one time." She explained defendant touched her "private part" in his vehicle after they dropped off his wife at the airport to go to Arizona. Boland asked Doe 3 follow-up questions to obtain details about the incident, such as whether defendant touched Doe 3 under or over her clothes. Boland then asked Doe 3 to tell her about other times when defendant may have touched her. Doe 3 related another time when

12.

defendant's wife went out and defendant convinced Doe 3 to take off her clothes; he pulled her pants down and touched her "private." Boland again asked follow-up questions regarding details of that incident, such as when it occurred. Boland then asked Doe 3 to tell her about any times when defendant touched her "private" on the skin, and Doe 3 responded that "he's never done that." Boland asked Doe 3 if there were any other times defendant touched her "private," and Doe 3 responded affirmatively. Boland asked Doe 3 to tell her about the other times. Doe 3 responded that she did not remember.

Boland then asked Doe 3 when she was first touched and when she was last touched. Doe 3 reported defendant began touching her when she was six years old and last touched her that past Thursday at defendant's office and his house. Boland asked her for details about the last incidents, and Doe 3 explained defendant touched her at the office when his wife was taking out the trash and at the house when her cousin Doe 2 was in the kitchen. Boland then asked Doe 3 to tell her about any time Doe 3 had seen defendant touching someone else, and Doe 3 responded defendant flirts with her cousin Doe 2 to make Doe 3 mad. After asking Doe 3 for details, Boland again told Doe 3 it was important for her to know everything that happened. Boland then asked Doe 3 if there were other places on her body that defendant had touched and if defendant had touched her more than one time on top of her underwear. Doe 3 responded it occurred once. Boland asked Doe 3 to tell her about any times defendant's hand or fingers touched inside her "private," and Doe 3 responded it happened once in the car on the way to Nevada. Defendant took off Doe 3's pants and underwear and "just went inside." Boland asked follow-up questions regarding that incident, such as what it felt like, what defendant said, and where defendant's wife was at the time.

Boland then asked Doe 3 to tell her about any times defendant made her touch his body. Doe 3 stated she never saw defendant's "body parts ever," but she reported defendant grabbed her hand and put it on his private twice, one time when defendant's

13.

wife was in the shower and another time on a trip to Sequoia National Park when they stopped for defendant's wife to use the restroom.

Boland then recapped what Doe 3 had told her and confirmed how many times defendant had touched her at his office; Doe 3 responded he touched her almost every time she went to the office. Boland then followed up with additional questions in response to Doe 3's answer, and Doe 3 responded the touching occurred over her clothes when defendant's wife was outside or not paying attention. Boland asked Doe 3 if defendant's wife ever saw, and Doe 3 responded there was "one time that hopefully she didn't see." That time, defendant touched her inside her bathing suit in his house. Boland again asked follow-up questions regarding that incident and asked if Doe 3 ever felt pain. Doe 3 said it would "hurt really bad" when he "would go inside it"; "[s]ometimes he would come back from working and his hands would be dirty, and it would just hurt." In response to Doe 3's use of the word "sometimes," Boland asked Doe 3 "how many times has he touched inside [her] private." Doe 3 said she remembered it happening 10 times. Boland asked Doe 3 whether defendant touched any other part of his body to her body and she asked Doe 3 about kissing. Doe 3 explained defendant would kiss her on the lips every time she would go home.

Boland then gave Doe 3 a picture of a girl's body and asked Doe 3 to mark the areas where defendant touched her; Boland reviewed each area Doe 3 marked, including the chest and buttocks, which Doe 3 had not previously discussed, and asked her for details regarding those incidents. Boland then gave Doe 3 a picture of a man's body and asked Doe 3 to mark where the "private" is; she then reviewed the two incidents Doe 3 discussed regarding defendant forcing her to touch his "private."

14.

## 2. *June 2017 CART interview*

In the second CART interview, Boland again explained to Doe 3 to correct her if she said something wrong and to tell her if Doe 3 did not understand a question. Nine-year-old Doe 3 promised to tell the truth and not tell any lies.

In response to Boland asking what happened to her, Doe 3 responded that defendant had "raped" and "molested" her and "he would touch [her] private parts a lot and he would try to … put his parts on [her] parts a lot." He first touched her when she was five years old. He last touched her in February 2016 at his house when she and her cousin spent the night there; he touched her private parts with his hands. Like in the first interview, Boland gave Doe 3 a picture of a girl's body and asked Doe 3 to mark where defendant had touched her. Doe 3 marked the breasts, "private," and buttocks.

Boland then asked Doe 3 to provide details about the touching, such as where and how often it would occur, what it felt like, and what defendant would use to touch her. Doe 3 explained defendant would squeeze her breasts, comment on their size, and put them in his mouth; he touched her there "[m]ostly every time. Like almost every day." Doe 3 would get angry when defendant touched her, and they would argue. Doe 3 noted none of her family ever saw defendant touch her. She also stated defendant touched her private with his hands and mouth and he put his "private" on her "parts." He would take off Doe 3's clothes and put his private on her private. He would make her sit on his lap facing him and wrap her legs around him. Boland asked Doe 3 to show her where defendant's private would touch her on the picture, and Doe 3 explained it would go inside the line of her "private." Boland asked Doe 3 what it felt like, what defendant would do with his body, and about any times something came out of defendant's private when he touched Doe 3's private. Doe 3 responded defendant would "twitch" and "stuff came out of his penis." Boland then asked follow-up questions regarding where, when, and how many times that occurred and where on Doe 3's body defendant would touch her with his penis. Doe 3 described instances when defendant touched her on her mouth,

15.

stomach, buttocks, and "private" with his penis, and Boland asked her follow-up questions about those instances.

At the end of the interview, Boland noted Doe 3 had told her things in the interview that she had not previously discussed. Boland asked Doe 3 if there was anything that had happened or if there was a reason why Doe 3 "decided to talk about more." Doe 3 explained that in the first interview, she was "nervous to tell [Boland] everything," but she had been going to see a therapist and now she felt more comfortable talking about it.

### 3. Court admitted CART interviews after holding an Evidence Code section 402 hearing

The court held an Evidence Code section 402 hearing to consider the admissibility and reliability of the interviews. During the hearing, Detective Florence Cotton explained a CART interview is conducted by a forensic specialist in a room designed to make the victim feel comfortable. The forensic interviewer asks "open-ended questions" and "determines whether or not the child knows the difference between the truth and a lie."

The court reviewed portions of the recorded CART interviews conducted on February 17, 2016, and June 7, 2017, to determine whether the time, content, and circumstances of the interviews showed sufficient indicia of reliability. Based on its review, the court held it was satisfied the interviews were conducted under circumstances providing sufficient indicia of reliability and, thus, they were admissible.

### B. Standard of Review and Applicable Law

Evidence Code section 1360 provides in pertinent part:

"(a) In a criminal prosecution where the victim is a minor, a statement made by the victim when under the age of 12 describing any act of child abuse … performed with or on the child by another … is not made inadmissible by the hearsay rule if all of the following apply:

16.

"(1) The statement is not otherwise admissible by statute or court rule.

"(2) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability.

"(3) The child … : [¶] (A) Testifies at the proceedings."

The California Supreme Court has identified the following nonexhaustive list of factors as being relevant to the reliability of hearsay statements made by a child witness in a sexual abuse case: (1) spontaneity and consistent repetition; (2) the declarant's mental state; (3) use of terminology unexpected of a child of a similar age; (4) lack of motive to fabricate; and (5) the child's ability to understand the duty to tell the truth and to distinguish between truth and falsity. (*In re Cindy L.* (1997) 17 Cal.4th 15, 29–30; see *Idaho v. Wright* (1990) 497 U.S. 805, 821–822, abrogated in part by *Crawford v. Washington* (2004) 541 U.S. 36, 60–62; *In re Lucero L.*(2000) 22 Cal.4th 1227, 1250.)

"We review a trial court's admission of evidence under [Evidence Code] section 1360 for abuse of discretion. [Citation.]" (*People v. Roberto V.* (2001) 93 Cal.App.4th 1350, 1367; see *People v. Waidla* (2000) 22 Cal.4th 690, 724.) A trial court has "broad discretion" in determining whether a party has established the foundational requirements for application of a hearsay exception. (*People v. Martinez* (2000) 22 Cal.4th 106, 120.) Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)

## C.    Analysis

Defendant contends Doe 3's two CART interviews "were not reliable based upon their content and upon the circumstances in which the statements were made." He argues, "The record demonstrates that the trial court gave no consideration to the circumstances surrounding these interviews in determining indicia of reliability." He

contends the admission of "this unreliable hearsay" violated his state and federal due process right to a fair trial and "undermined the fundamental fairness." Accordingly, he argues the alleged error should be assessed for prejudice under the standard articulated in *Chapman v. California* (1967) 386 U.S. 18, 24. He argues he was prejudiced because without the CART interviews, the jury likely would have acquitted him on the "[Doe 3] counts" because her trial testimony "was contradictory and incredible." The People respond the court properly admitted the two CART interviews. They further contend any alleged error should be reviewed for prejudice under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 and that "it is not reasonably probable the jury would have acquitted [defendant] of the charges involving [Doe 3] if the CART interviews had been excluded." As detailed below, we cannot conclude the court abused its discretion in admitting Doe 3's CART interviews.

### 1. February 2016 CART interview

Defendant first asserts the February 2016 CART interview "was tainted by leading questions" in that Boland "did not accept [Doe 3]'s answers, and it became clear from subsequent questions what Ms. Boland wanted to hear was multiple acts of molest, not details." Defendant argues Doe 3 initially mentioned she was only touched on two different occasions but later described more in response to Boland's questioning. He cites instances when Doe 3 described specific incidents of molestation in the interview, and Boland followed up by asking Doe 3 what else defendant had done or asked Doe 3 to tell her about other times. Defendant argues "[e]very time [Doe 3] tells Ms. Boland that she's told her the whole story, Ms. Boland asks for more and states specifically the conduct that Ms. Boland wants to hear about." He contends Boland's questions were suggestive, pointing to instances when Boland asked Doe 3 to tell her what defendant said while touching her on her private or about skin-to-skin contact and penetration. In his reply brief, defendant further alleges Doe 3's mental state made her statements

18.

unreliable. The People argue most of the questions were open-ended and the court viewed a recording of the interview and determined for itself the interview was sufficiently reliable. They contend Boland's questions "were utilized to elicit as much information as possible from a reluctant and nervous eight-year-old girl who was speaking with Boland for the first time." The People further argue defendant mischaracterizes Boland's questioning as refusing to accept Doe 3's answers; but Boland "was being thorough by asking whether there was more than one incident of molestation." We agree with the People.

The trial court did not abuse its discretion in concluding the time, content, and circumstances of Doe 3's first CART interview provided sufficient indicia of reliability. Contrary to defendant's assertions, the trial court could have reasonably found that Doe 3's statements to Boland were largely made in response to open-ended questions. Indeed, our review of the record reveals Boland generally asked Doe 3 to tell her about defendant touching her, and Boland followed up on Doe 3's statements to obtain specific details about the incidents of abuse Doe 3 described. In asking Doe 3 to tell her about other times or incidents of abuse, we cannot conclude Boland was leading or suggesting to Doe 3 to lie or manufacture a response. Rather, in both CART interviews Boland emphasized the importance of Doe 3 telling the truth. Though Doe 3 initially reported only two instances of abuse, she later volunteered additional information regarding other incidents of abuse, which Boland followed up on in her questioning. To the extent defendant is challenging the reliability of the CART interview based on the consistency of Doe 3's answers, Doe 3 testified at trial, so she was subject to cross-examination regarding her credibility and any alleged prior inconsistent statements. Furthermore, the first CART interview was conducted less than a week after Doe 3 first reported sexual abuse. We also do not find that Doe 3 used unexpected terminology in describing the abuse nor does the record reveal Doe 3 had a motive to fabricate her statements during that interview. Additionally, nothing about the interview suggests Doe 3's mental state was in question

19.

at the time it was conducted. And, contrary to defendant's assertion, the court expressly stated it was reviewing the interviews to consider the time, content, and circumstances under which they took place. Thus, the record reflects the court was aware of and executed its duty to consider these factors in determining whether such evidence bore sufficient indicia of reliability to merit their admission. On this record, we cannot conclude the court erred in concluding the first CART interview bore sufficient indicia of reliability to merit its admission.

## 2. *June 2017 CART interview*

Defendant next asserts the circumstances surrounding the second CART interview also lacked indicia of reliability because his wife, who had the most to gain from defendant's convictions, lived with Doe 3 at the time of the interview. He argues "the trial court did nothing to ascertain anything about [Doe 3]'s living situation leading up to these 'additional' allegations or why [Doe 3] had 'new' allegations over a year after the first CART interview." Additionally, he contends "the circumstances surrounding [the] second interview also show that [Doe 3] had learned that additional allegations brought her attention, approval, and sympathy from the adults in her life: her family, Detective Cotton, and the CART interviewer." He argues Doe 3's use of "adult vocabulary" such as the terms "rape" and "molest" "should have put the trial court reviewing this interview for [Evidence Code] section 1360 purposes on notice that [Doe 3] had adopted the vocabulary of the adults who had been talking to her." He further contends Doe 3's allegations "were outrageous and impossible." The People again respond the time, content and circumstances of the second interview provided sufficient indicia of reliability. They assert many of Doe 3's allegations were consistent with her first interview, and her additional allegations were made after she spoke with a therapist. The People further contend, "[Doe 3]'s mental state does not support an inference that her statements were unreliable" and her language in the interview was age-appropriate. They

argue defendant "fails to explain how [his wife] would or did obtain a financial reward from [Doe 3]'s allegations against" defendant. They assert defendant points to nothing in the record to support his allegation Doe 3 obtained attention, approval, and sympathy from the adults in her life as a result of her report of sexual molestation. Finally, they contend "there is no evidence that [defendant's wife] told [Doe 3] what to say or instructed her to make up allegations against" defendant. Again, we agree with the People; the trial court did not abuse its discretion in concluding the second CART interview bore sufficient indicia of reliability.

Contrary to defendant's assertions, the record does not reflect Doe 3 was motivated to lie in order to seek attention or approval or because of defendant's wife's influence. Additionally, as discussed, to the extent Doe 3's credibility was in question, she testified at trial and was available for cross-examination. We also cannot conclude Doe 3's use of the terms "rape" and "molest" was inappropriate for her age such that the reliability of the interview should have been called into question on that basis. And nothing in the record suggests Doe 3's mental state was in question at the time of the second interview such that the trial court should have deemed her statements to be unreliable. Rather, as in the first interview, Doe 3 responded spontaneously in response to largely open-ended questions. Though she disclosed additional allegations in the second interview, the new allegations built upon Doe 3's previous reports of abuse. Additionally, Doe 3 explained she felt more comfortable discussing the abuse after working with a therapist. On this record, we cannot conclude the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner in admitting Doe 3's second CART interview.

We reject defendant's first contention.

## II.    Prosecutorial Misconduct

Defendant next contends the prosecutor repeatedly engaged in prejudicial misconduct.

### A.    Standard of Review and Applicable Law

"""'[A] prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.]""" (*People v. Hill* (1998) 17 Cal.4th 800, 819.) "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44; see *People v. Mendoza* (2007) 42 Cal.4th 686, 700; *People v. Farnam* (2002) 28 Cal.4th 107, 167.) "The focus of the inquiry is on the effect of the prosecutor's action on the defendant, not on the intent or bad faith of the prosecutor." (*People v. Mendoza*, *supra*, at p. 700.) "'A defendant's conviction will not be reversed for prosecutorial misconduct, however, unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.'" (*People v. Tully* (2012) 54 Cal.4th 952, 1010.)

### B.    Waiver and Ineffective Assistance of Counsel

Here, defense counsel lodged no objections to the prosecutor's conduct defendant now challenges on appeal. "'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.'" (*People v. Hill*, *supra*, 17 Cal.4th at p. 820.) An exception is made if a timely objection or request for admonition would have been futile,

22.

or if an admonition would not have cured the harm caused by the misconduct. (*Ibid.*) "The reason for this rule, of course, is that 'the trial court should be given an opportunity to correct the abuse and thus, if possible, prevent by suitable instructions the harmful effect upon the minds of the jury.'" (*People v. Green* (1980) 27 Cal.3d 1, 27, overruled on other grounds in *People v. Martinez* (1999) 20 Cal.4th 225, 239.)

In his reply brief, defendant contends for the first time that his trial counsel rendered ineffective assistance of counsel by failing to object to the prosecutor's challenged comments below. To prove ineffective assistance of counsel, a defendant must satisfy the two-part test of *Strickland v. Washington* (1984) 466 U.S. 668 requiring a showing of counsel's deficient performance and prejudice. (*Id.* at p. 687.) As to deficient performance, a defendant "must show that counsel's representation fell below an objective standard of reasonableness" measured against "prevailing professional norms." (*Id.* at p. 688.) The prejudice prong requires a defendant to establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.* at p. 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid.*) Prejudice must be affirmatively proved. (*People v. Maury* (2003) 30 Cal.4th 342, 389.) Where a defendant fails to show prejudice, a reviewing court may reject a claim of ineffective assistance of counsel without reaching the issue of deficient performance. (See *Strickland*, *supra*, at p. 697.)

However, when a defendant fails to raise an issue in the opening brief, raising it for the first time in a reply brief, we generally decline to address the issue or address it in a summary manner. (See *People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9 [claim of ineffective assistance of counsel raised by defendant for the first time in reply brief is forfeited]; *People v. Harris* (2008) 43 Cal.4th 1269, 1290 [defendant's claim of ineffective assistance of counsel for failure to object to prosecutor's argument, made for first time in reply brief in response to waiver argument, "is as meritless as it is belated"];

23.

*People v. Alvarez* (1996) 14 Cal.4th 155, 241, fn. 38 ["'perfunctorily'" rejecting defendant's claim of ineffective assistance of counsel, made for the first time in reply brief and in a single paragraph].)

Nevertheless, here, as we explain *post*, even if these issues had been adequately preserved for our review, defendant has failed to establish the prosecutor engaged in prejudicial misconduct. Thus, both defendant's prosecutorial misconduct and ineffective assistance of counsel claims fail.

### C.    Analysis

Defendant argues nine specific instances of alleged prosecutorial misconduct. He contends the prosecutor: (1) made "material misrepresentations" about Family Law and his wife's community property interest in the marital assets, (2) misrepresented the status of his and his wife's community property, (3) misrepresented California community property law regarding dissolution of the marital estate, (4) falsely accused the defense of misleading the jury, (5) made false claims about the timing of the molestation allegations that took place in defendant's home and shop, (6) falsely claimed the medical records corroborated the Doe 3's claims, (7) falsely claimed that defendant's ability to achieve an erection and ejaculation was not relevant to the charges, (8) misrepresented the DNA data, and (9) misrepresented defendant's testimony. We address and reject each of defendant's contentions in turn.

### 1.    Alleged misrepresentations about Family Law and defendant's wife's community property interest in marital assets

Defendant first contends the prosecutor committed prejudicial misconduct during argument by arguing there was "no money" when referring to defendant and his wife's marital assets.

### (a)    Relevant Procedural History

Defendant's wife testified she and defendant sold their house and rental properties and liquidated their company; the resulting money went into a trust. She explained there

24.

was a large community debt of over $160,000 plus taxes to be paid. Defendant's wife testified, after her divorce from defendant is final, "[t]here's not going to be anything left." She denied defense counsel's assertion that she would be getting half of $377,000. Defendant's wife explained the court first had to determine the community debt before the amount of community property could be ascertained, and she did not know what was going to happen. Defendant confirmed the court had them sell their house and rental properties and that they still owed approximately $40,000 on the house. He also testified all the money from the sale of those assets was in a trust account.

During the prosecutor's argument, she argued:

"… The defense wants you to believe that [defendant's wife] is a mastermind, a conspiracy theorist and a manipulator and that's the only reason why all three [victims and their mothers] go to every court appearance, show up every time, have stood here every day in trial, and come in and testify in front of a bunch of strangers, is because [defendant's wife]'s all about the money? There is no money. None.

"The defense isn't required to prove to you anything. That is my burden. I need to prove everything beyond a reasonable doubt. If they're gonna stand here and tell you that this is all about the money, where is it? Because right now there's no house. There's no rental properties. There's no business. There's nothing. It's liquidated and in a trust. Why? Because they're getting a divorce. And they're not getting a divorce because [defendant's wife] wants the money. They're getting a divorce because the defendant is a child molester and she wasn't going to stand by him. That's it."

### (b) Analysis

Defendant argues the prosecutor's representation that defendant and his wife's marital estate was valued at "zero" was not supported by evidence in the record. He further contends such a statement was false given the filings in the divorce proceedings by the attorney for defendant's wife stating the total property on hand was $364,000. Defendant also argues the prosecutor misled the jury by stating "there was no money" because the marital assets had been liquidated and placed in a trust. He contends the

prosecutor's conduct amounted to the "'use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'" He asserts the alleged misconduct was prejudicial because it "undermined the defense position that [defendant's wife] had put [the victims] up to false allegations of molestation for her own financial gain." We disagree with defendant's contentions.

Here, the prosecutor's referenced argument was reasonably based upon the testimony presented and was a fair comment on the evidence; it was not prejudicial misconduct. Both parties explained their properties had been sold, the business had been liquidated, and the proceeds were placed in a trust. Defendant's wife expressly testified she did not believe there would be any money left for her to receive after their debts had been paid and the divorce was finalized. Contrary to defendant's assertion that no evidence in the record supported the prosecutor's argument, his wife's testimony is evidence. (See Evid. Code, § 140 ["'Evidence' means testimony, writings, material objects, or other things presented to the senses that are offered to prove the existence or nonexistence of a fact"].) And, as the People note, defendant's assertion that his wife's attorney represented the assets of the marriage totaled $364,000 in the divorce proceedings was not supported by evidence submitted at trial. Irrespective, defendant's wife testified the money held in trust did not account for the community debt that needed to be paid. On this record, we conclude the complained-of remarks made by the prosecutor "were founded on evidence in the record and fell within the permissible bounds of argument." (*People v. Williams* (2013) 56 Cal.4th 630, 672.)

### 2. *Alleged misrepresentation regarding status of community property of defendant's marriage*

Defendant next argues the prosecutor's question to defendant regarding whether the cash in the house belonged to both him and his wife, and the prosecutor's related argument, constituted misconduct.

26.

### (a) Relevant Procedural History

On direct examination, defendant testified that when he returned to his and his wife's house after work on February 12, 2016, he checked the fire safe and the cash that had been inside it was gone. According to defendant, there had been a total of $126,000 in two fire safes in the house. Defendant testified on direct examination that he was not concerned that the money was gone because it belonged to him and his wife. He also testified he charged Ms. D. $20 a month for electricity while she lived with them because she used her computer for work.

On cross-examination, the following exchange took place between the prosecutor and defendant regarding the money in the house:

> "[PROSECUTOR:] Q. … First of all, you never ever filed a police report about [your wife] taking 126,000 from the house, did you?
>
> "[DEFENDANT:] A. No, I did not. Why would I?
>
> "Q. Right, because it was both of your money that was in the house; correct?
>
> "A. That's correct…."

In argument, the prosecutor argued defendant was "fixated on the money" and "somebody paying him back for utilities." The prosecutor continued:

> "… Yet there is no mention whatsoever of [defendant's] concern of 126,000. His response was it was our money. We shared it. If [defendant's wife] did take it, it was our money.
>
> "Then how does the defense of 'it's all about the money' come into play if the defendant himself doesn't care?"

### (b) Analysis

Defendant argues the prosecutor's referenced questioning and argument amounted to "a gross misrepresentation of the Family Law Code's community property statutes" because "[defendant's wife] had no right to take and secret a community asset." We disagree with defendant's characterization of the referenced questioning and argument.

First, where, as here, "a defendant voluntarily testifies, the district attorney may fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them." (*People v. Cooper* (1991) 53 Cal.3d 771, 822; see *People v. Dykes* (2009) 46 Cal.4th 731, 764 ["When a defendant chooses to testify concerning the charged crimes, the prosecutor can probe the testimony in detail and the scope of cross-examination is very broad"].) And here, the challenged questioning was proper cross-examination; the prosecutor was further probing the statements defendant made on direct examination.

And the prosecutor's related argument in summation to the jury was a fair comment on the evidence. The prosecutor referred to defendant's testimony in arguing defendant believed the money in the house belonged to both him and his wife, and he was not concerned if his wife had taken it. The prosecutor did not assert, as defendant alleges, that defendant's wife had a right to take and secret property as a matter of law. Accordingly, the referenced questioning and argument were not misstatements of law and did not amount to misconduct.

### 3. *Alleged misrepresentation of California community property law*

Defendant next alleges the prosecutor misrepresented California law on community property by arguing defendant did not need to be a child molester for his wife to divorce him and she would not get more money on that basis.

### (a) Relevant Procedural History

During argument, the prosecutor stated:

> "[T]hey're not getting a divorce because [defendant's wife] wants the money. They're getting a divorce because the defendant is a child molester and she wasn't going to stand by him. That's it. There's no requirement in the State of California that your husband needs to be charged with child molest in order to get a divorce. You don't get any more money because your husband went on trial for being a child molester. Not at all. It just doesn't happen. [¶] … [¶]

28.

"[T]here is no reasonable explanation as to why [the victims] would say this. The divorce has nothing to do with it at all. [Defendant's wife] made up her mind to divorce [defendant] because of what [the victim] said about him. *Again*, *you do not need to have a child-molesting husband to get a divorce in California. You certainly don't get any more money for it*." (Italics added.)

### (b)     Analysis

Defendant contends the referenced argument was false; rather, "[Defendant's wife] positioned herself to obtain more of the marital assets by sending her husband to jail as a child molester than she would have received in a settlement if she had simply filed for divorce." He argues, "[Defendant's wife] acted to destroy a business that she no longer wanted to operate, and the most effective way to accomplish her goal was to put [defendant] in jail." As a result, "[i]nstead of a lump sum payment based upon liquidation of all the assets, [defendant's wife] would have received payments over time, and possibly less than she received in a lump sum distribution." Additionally, "[defendant's wife] set up [the victims] for direct victim restitution, paid out of [defendant]'s share of the marital assets."

Defendant cites no law in support of his contention that the referenced argument was false. To the contrary, the prosecutor's statements that there is no requirement in the State of California that a husband needs to be charged with child molest in order to get a divorce is true; California is a no-fault divorce state. (See Fam. Code, § 2310; *Diosdado v. Diosdado* (2002) 97 Cal.App.4th 470, 473 [noting since the 1969 enactment of Civ. Code, § 4506 (now Fam. Code, § 2310), "[f]ault is simply not a relevant consideration in the legal process by which a marriage is dissolved"]; see also Fam. Code, § 2335 ["Except as otherwise provided by statute, in a pleading or proceeding for dissolution of marriage or legal separation of the parties, including depositions and discovery proceedings, evidence of specific acts of misconduct is improper and inadmissible"].) We also do not find support for defendant's assertion that his wife positioned herself to obtain more of the marital assets through the accusations against defendant beyond

29.

speculation. Furthermore, even if the child victims were entitled to restitution, there is no evidence to support defendant's suggestion that his wife would benefit from such payments. Accordingly, we cannot conclude the referenced argument amounted to misconduct.

### 4. *Accusing defense of misleading the jury*

Defendant next argues the prosecutor committed misconduct in making an "unsupported implication … that defense counsel fabricated a defense."

### (a) Relevant Procedural History

During the first CART interview, Doe 3 testified defendant last touched her that past Thursday at the office and at his house when she and Doe 2 spent the night. She stated that night, Doe 2 was in the kitchen and defendant's wife was in the shower while she and defendant were on the couch. Defendant reached over and touched her. During her second CART interview, Doe 3 again stated the last time defendant touched her was in February 2016, when she and Doe 2 spent the night at his house. She explained Doe 2 "came over and we were hanging out and when we fell asleep we were on the trampoline and he started touching me on my private parts again." At trial, Doe 3 discussed the last incident of molest, stating they picked up Doe 2, and defendant "went to show me the cars out in the back. I looked at them. We went on the trampoline. He was being nasty." She testified the cars were behind the house and the trampoline was behind the cars. Doe 3 went on the trampoline alone for "[n]ot too long because then it started to get cold." Defendant tried to get her to touch his private parts while they were looking at the cars. On cross-examination, Doe 3 testified she did not recall stating in a CART interview that she and Doe 2 had fallen asleep on the trampoline that night, or that defendant had touched her inappropriately when they were sleeping on the trampoline.

In summation, defense counsel argued there were inconsistencies in Doe 3's statements:

30.

"… So [Doe 3] came in and she testified that on the night of the 11th that was the last time that something happened to her.

"Now, she told her mom that something had only happened to her twice. She had been sexually molested or touched on the outside of her clothing. Then she told the CART interviewer that the last time something happened she was sitting in the living room. [Doe 2] went into the other room, and maybe got water, and that's when something happened.

"Then she tells the CART interviewer in the second CART interview that they were sleeping out on the trampoline in the middle of February, she and [Doe 2]. That's when [defendant] came out and molested her. And then when she testified, she said the last time that something happened to her [defendant] took her out to see vehicles. That's when he molested her out by the trampoline.

"Now, this is [*sic*] multiple different stories. Of course, the prosecutor has suggested that well, [Doe 3] is just really confused. Everything blends together. Watch the CART interviews. She was very specific that the last time something happened to her was February 11th. She's giving very different accounts of the same night. Which one is it we're supposed to believe? Which one? Which one are we convicting him of? Beyond a reasonable doubt, which one of those four or five different statements is the truth? I mean, I don't know. I don't know. So that's a whole lot of different statements. Again, they don't really add up. Again, we're just searching for doubt here as we go through the story."

In rebuttal, the prosecutor asserted Doe 3's statements regarding the trampoline in the CART interview were "very wildly being mischaracterized." The prosecutor asserted:

"… If you listen to the CART interview, she's talking about the independent [*sic*], how they went on the trampoline, they fell asleep, and the defendant touched her that night, describing that he touched her that night at the house, how he had touched her previously at the shop, and then he touched her that night at the house.

"At no point is [Doe 3] saying I was sitting on the trampoline with my cousin and we fell asleep on the trampoline that night and the defendant touched me on the vagina that night on the trampoline. She's just trying to get out that this is the last incident that she recalls. This is one of the last times.

31.

"So if you need to be refreshed, absolutely go watch that CART interview, because everything that you need to convict the defendant is contained in those statements and those interviews."

### (b) Analysis

Defendant asserts the prosecutor argued facts not in evidence and implied defense counsel "fabricated a defense" in the referenced rebuttal statements. He further contends "[t]he transcript of the [second] CART interview demonstrates that the prosecutor's claims [are] unsupported and false." Again, we disagree with defendant's characterization of the challenged rebuttal argument and find no prejudicial misconduct.

It is "improper for the prosecutor to imply that defense counsel has fabricated evidence or otherwise to portray defense counsel as the villain in the case." (*People v. Sandoval* (1992) 4 Cal.4th 155, 183.) But it is not misconduct to challenge "the persuasive force of defense counsel's closing argument." (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1155, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

In the referenced rebuttal argument, the prosecutor did not imply defense counsel "fabricated a defense." Rather, she was arguing the evidence should be read differently from the manner defense counsel argued, and that Doe 3's statements could be reconciled. This did not amount to an attack on defense counsel personally, but rather was a permissible challenge to the persuasive force of defense counsel's closing argument. (See *People v. Dykes*, *supra*, 46 Cal.4th at p. 772.)

Additionally, here, the focus of the prosecutor's referenced argument was in interpreting Doe 3's statement during the CART interview that she and Doe 2 "were hanging out and when we fell asleep we were on the trampoline and he started touching me on my private parts again." The prosecutor's assertion Doe 3 was listing separate events that occurred that night, rather than explaining the touching occurred while she was on the trampoline, was a reasonable inference to be drawn from this evidence. This

32.

was a particularly reasonable inference in light of Doe 3's subsequent trial testimony in which she explained these were separate events that occurred that night.

However, even if the prosecutor's statement—"At no point is [Doe 3] saying I was sitting on the trampoline with my cousin and we fell asleep on the trampoline that night and the defendant touched me on the vagina that night on the trampoline"—could be considered in conflict with Doe 3's statement in the second CART interview, we conclude any alleged error was harmless. Both the prosecutor and defense counsel directed the jury to review the CART interview in resolving what Doe 3 said. (See *People v. Redd* (2010) 48 Cal.4th 691, 735 [rejecting prosecutorial misconduct claim where prosecutor's comments "focused the jury upon the evidence rather than distracting it from its task"].) Furthermore, the jury was instructed, "Nothing the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence. Their questions are not evidence. Only the witness' answers are evidence." We presume the jury followed these instructions. (See *People v. Edwards* (2013) 57 Cal.4th 658, 764 [presuming jury will follow instruction that statements of attorneys are not evidence]; *People v. Avila* (2009) 46 Cal.4th 680, 719 [same]; see also *People v. Bryden* (1998) 63 Cal.App.4th 159, 184 ["Further, the court instructed the jury that questions and statements by the attorneys do not constitute evidence, and the jury is presumed to follow the court's instructions"].) On this record, we cannot conclude the referenced argument constituted prejudicial misconduct.

Additionally, as noted at the outset, defense counsel did not object to the prosecutor's statement. "[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 502.) Here, the record does not reveal why defense counsel did not object to the prosecutor's statements. And, while objecting was one tactical option, defense counsel could have reasonably decided the prosecutor's argument fell within the bounds of proper argument in deciding not to object. Thus, we also cannot conclude

33.

defendant has established his counsel was ineffective for failing to object to the challenged argument or that he was prejudiced thereby.

### 5. *Alleged false claims about the timing of specific molestation allegations*

Defendant next argues the prosecutor falsely claimed defendant corroborated part of Doe 1's and Doe 2's statements regarding when an alleged incident of sexual misconduct occurred.

#### (a) Relevant Procedural History

Defendant testified there were times Doe 1 and Doe 2 would come out to the shop while he was working there. According to defendant, one time, Doe 2 wanted to be pushed around in the cart, and she went around taking tools off the wall. Defendant, however, denied Doe 2 ever laid down naked on the cart. He testified he did not know if he took Doe 1 and Doe 2 out to the shop when his wife and Ms. D. were in Arizona, but if they did go to the shop, "they didn't use no vibrator on 'em."

During rebuttal argument, the prosecutor discussed the evidence presented and stated, "You have the defendant talking about taking [Doe 1 and Doe 2] into that shop, them being into that shop, that being his area, corroborating the exact same weekend that [defendant's wife] and [Ms. D.] were out of the house."

#### (b) Analysis

Defendant contends the cited rebuttal argument was false because defendant never said he took Doe 1 and Doe 2 to the shop behind his residence during the weekend his wife and Ms. D. went to Arizona. He asserts the false statement that defendant corroborated the incident "lent a certainty to a claim by [Doe 1 and Doe 2] that had as many inherent problems as the other shifting stories of victimization in this case." The People concede the prosecutor misstated that defendant corroborated that he, Doe 1, and Doe 2 went to his shop during the weekend his wife and Ms. D. were gone, but they assert the error was harmless. We agree any alleged error was harmless.

34.

Prosecutorial misconduct occurs where a prosecutor misstates evidence during argument or makes statements regarding facts that are not in evidence. (*People v. Linton* (2013) 56 Cal.4th 1146, 1207; *People v. Davis* (2005) 36 Cal.4th 510, 550.) When evaluating claims of improper argument to the jury, "'"the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."'" (*People v. Adams* (2014) 60 Cal.4th 541, 568.)

We conclude there is not a reasonable likelihood the jury construed or applied the complained-of remarks in an objectionable fashion. Here, the challenged comment was brief and minor in the context of the argument as a whole. The prosecutor did not engage in repeated or egregious conduct. And, as discussed, the jury was instructed the attorneys' statements are not evidence and we presume the jury followed these instructions.

Additionally, the evidence supporting the related charged crimes was strong. Both Doe 1 and Doe 2 separately discussed details of the incident involving Doe 1 taking photographs of Doe 2 using a vibrator while on an orange hydraulic lift at defendant's shop at his direction. They both described the vibrator, the circumstances of the incident including how and where it took place, and that Doe 1 took pictures on defendant's flip phone. Doe 1 explained the presentation at her school regarding the taking of child pornography prompted her to disclose the incident, and other evidence corroborated Doe 1's claim such a presentation was shown at her school in February of 2016 before she disclosed the incident. On this record, we cannot conclude it was reasonably probable the prosecutor's brief misstatement during closing argument affected the jury's verdict. Rather, we conclude the alleged error was harmless.

### 6. *Alleged misrepresentation of medical records corroborated Doe 3's claims*

Defendant next argues the prosecutor falsely stated Doe 3's medical records corroborated her claims.

35.

### (a)      Relevant Procedural History

Ms. M. testified there was a certain period of time during which Doe 3 was getting urinary tract infections.  She recalled a specific instance in 2014 when Doe 3 had sharp pain when she urinated, and she was diagnosed with a urinary tract infection.  The prosecutor moved to introduce Doe 3's medical records related to that incident as an exhibit.  In response to further questioning, Ms. M. testified Doe 3 had zero urinary tract infections since defendant stopped seeing her.

In argument, the prosecutor directed the jury to Doe 3's medical records and stated:

> "Do these medical records prove that the defendant put his penis in [Doe 3]'s vagina?  No.  Why did you hear about them?  Because it shows that Doe 3 had pain.  She had pain in her stomach, and she had pain when she was urinating.  And her mom took her to the doctor….  [¶] But what do we know about these medical records?  What do we know about these urinary tract infections that [Doe 3] got frequently?  That she got zero after she stopped being around the defendant.  Not one, not less frequent, not as many as before. Zero.  None.  And that's corroboration.  That's circumstantial evidence."

During defense counsel's closing argument, she, too, discussed Doe 3's urinary tract infections:

> "Also, of great significance, and you'll be able to see it back in the jury room, is that [Doe 3], in 2014, did go to the doctor for urinary tract infections.  Her mother testified that her mother gets urinary tract infections.  Their whole family gets urinary tract infections.  That's not the issue.  The issue is during that visit the doctor actually did a full exam.  No, they didn't use instruments, but they did an exam.  Look at the medical exam when you're back in the jury room.  It says 'genital exam.'  It says 'normal.'  So if a little girl was being raped by a grown man, it would not be normal.  Again, this information was never requested by Detective Cotton."

And in rebuttal, the prosecutor again noted, "You have the medical records that show that [Doe 3] got UTIs frequently.  As soon as she wasn't around the defendant anymore, she got zero."

36.

### (b) Analysis

Defendant contends the prosecutor's statement in rebuttal constituted misconduct because it was a false statement; rather, "[t]here was no medical evidence that [Doe 3] had frequent urinary tract infections that ceased when she was separated from [defendant]." The People concede the medical records only discuss one urinary tract infection rather than frequent urinary tract infections. However, they argue the prosecutor's misstatement was harmless because there was other evidence Doe 3 got frequent urinary tract infections, namely Ms. M.'s testimony. Accordingly, they contend there was not a reasonable probability the jury would have rendered a more favorable outcome absent the prosecutor's statement. We agree with the People and again, we find no prejudice.

Here, both the prosecutor and defense counsel argued Doe 3 went to the doctor for urinary tract infections (plural). But they both directed the jury to review the medical records, which reflected a single urinary tract infection diagnosis. Ms. M. testified Doe 3 got urinary tract infections during a certain period of time and that Doe 3 had not had any such infections once she stopped seeing defendant. The jury was instructed: "Evidence is the sworn testimony of witnesses and exhibits that were admitted into evidence," and that nothing the attorneys say is evidence, and we presume the jury followed this instruction. On this record, we cannot conclude the prosecutor's brief comment prejudiced defendant.

### 7. *Argument that defendant's ability to achieve erection and ejaculation was not relevant to the charges*

Defendant contends the prosecutor committed misconduct by stating defendant was not charged with getting an erection and that he was not required to achieve an erection under the law.

37.

### (a) Relevant Procedural History

During trial, defendant testified his sex life changed as he got older because his penis did not function at full capacity anymore due to his diabetes. He explained, for a long time, he was physically unable to have sex. In rebuttal, the prosecutor addressed defendant's alleged inability to get an erection:

> "Regarding the defendant not being able to get an erection, I have one word for you: Foreplay. That's what he does when he's masturbating while touching [Doe 2]'s vagina. That's what he's doing when he's masturbating and putting his penis on [Doe 3]'s stomach and putting his penis in [Doe 3]'s mouth. That is called foreplay. *The defendant is not charged with getting an erection. He's not required to have an erection under the law at all.*" (Italics added.)

### (b) Analysis

Defendant argues the prosecutor's statement in rebuttal was false and prejudicially misleading as a matter of fact and law because his "sexual health was highly relevant on a number of points," and he was required to have an erection for counts 1 through 3 for sex with a child under 10 years of age. The People respond, though defendant's ability to get an erection may have been relevant to the case, it was not required to prove any of the sexual crimes of which defendant was convicted; thus, the prosecutor's argument was proper. We agree with the People and cannot conclude the cited argument was prejudicial misconduct.

While defendant's ability to obtain an erection may have been relevant to his defense, the referenced statements in the prosecutor's rebuttal are true: it was not an element of any of the charged crimes and there was no requirement under the law that the prosecution prove defendant was able to have an erection for defendant to be convicted of the charged crimes. Thus, we cannot conclude the challenged statement was misconduct.

It also bears noting, defendant did not testify he was completely unable to achieve an erection, but rather for a long time he was physically unable to have sex, and his penis functioned, but not at full capacity. No evidence was introduced as to when this alleged

38.

decrease in functionality occurred and whether the timing overlapped with the charged offenses reducing the potential relevance of such evidence to the charged crimes. On this record, we also cannot conclude defendant was prejudiced by the prosecutor's statement.

### 8. Alleged misrepresentation of DNA data

Defendant next contends the prosecutor falsely argued seminal fluid was found in the upholstery of defendant's truck.

### (a) Relevant Procedural History

Julie Hale, a Forensic Criminalist from the Department of Justice (DOJ), testified she examined pieces of seat material from defendant's truck for stains that visually appeared to be biological fluid. One of the samples tested positive for P-30, a protein found in high concentration in seminal fluid, but that could also be found in other bodily fluids including vaginal secretions, breast milk, and male urine.

During argument, the prosecutor noted Hale's testimony that the P-30 protein was found in the part of defendant's truck where Doe 2 described an incident occurring during which defendant pulled her pants down, put his finger in her vagina while masturbating himself, and ejaculated. The prosecutor noted such evidence was "[a]bsolutely not" a "smoking gun," but still was circumstantial evidence. The prosecutor noted, "It's not a slam dunk saying this actually happened, but it's not [*sic*] there exactly in the same place that [Doe 2] said it would be."

In defense counsel's closing argument, he argued: "Another critical case is they tested two different vehicles of [defendant]'s. They cut on the cushions and had them tested for semen. The DOJ came and testified there was no semen on any seat cover at all. None, zero. Not on truck one, and not on truck two." "Now, given the statements made by the girls that involved semen and ejaculation and digital penetration and all of these very specific statements, that would be a really good time [for Detective Cotton] to sit down and talk to the girls and say, hey, there's zero semen. Not like a little bit, not

like there's not enough to test.  There's actually none.  Zero.  But no, she didn't do that, because, again, there was no thorough investigation."

In rebuttal, the prosecutor again noted the jury heard "evidence from the Department of Justice that P-30, *which is the protein found in seminal fluid*, *doesn't have to have semen in it*.  It's the protein found in seminal fluid and vaginal secretions were [*sic*] found in the back seat of the defendant's truck, exactly where [Doe 2] said this incident happened."  (Italics added.)

### (b) Analysis

Defendant argues the prosecutor's assertion seminal fluid was found in defendant's truck was false and "in no way a fair comment on the evidence."  He argues the criminalist testified P-30 is found in vaginal secretions, breast milk, male blood, and urine, and she could not name the source of the P-30 found in defendant's truck.  He notes "the jury rejected [Doe 2]'s allegations about sex in [defendant's] truck," "[b]ut the jury likely took the prosecutor's false statement about [Doe 3]'s medical records and combined it with her false statement about finding seminal fluid in the truck as corroboration for [Doe 3]'s … claims about being molested and about intercourse in [defendant's] truck."  The People respond the prosecutor properly stated, "[A] protein found in seminal fluid was found in the upholstery of [defendant's] truck."  We agree with the People.

The prosecutor's statements were fair comments on the evidence presented.  Relying on the criminalist's testimony, the prosecutor argued P-30, a protein found in high concentrations in seminal fluid along with other bodily fluids, was found in defendant's truck.  The prosecutor noted such evidence was not a smoking gun or a slam dunk, but nonetheless constituted circumstantial evidence of the charged crimes.  We cannot conclude the referenced argument was misconduct.

### 9. *Alleged misrepresentation of defendant's testimony*

Finally, defendant contends the prosecutor "materially" and "prejudicially" misrepresented his testimony by arguing he corroborated the molest allegations.

#### (a)     Relevant Procedural History

The prosecutor argued defendant, in his testimony, corroborated statements made by Doe 3 and Doe 2. She argued, "Every time [Doe 3] talked about a specific incident, the defendant corroborated it. He just left out the molesting, but he remembered the exact same details."

> "You have the defendant corroborating that exact trip from LA, that trip to Nevada, that trip to the Sequoias.
>
> "And I'm only going to use one pencil, because he corroborated that trip to the airport, too. *He corroborated every single incident that [Doe 3] described*, *that [Doe 2] described*. He just left out the points where he molested them." (Italics added.)

#### (b)     Analysis

Defendant claims the prosecutor's assertion that he corroborated the incidents Doe 3 and Doe 2 described was false. He asserts, "To corroborate the molest claims, [he] would have had to have made an admission that [Doe 3] was correct about what happened during the incidents." Again, we disagree with defendant's characterization of the challenged argument and find no prejudicial misconduct.

Contrary to defendant's assertions, the prosecutor expressly noted defendant did not corroborate the molest allegations. Rather, she argued defendant's testimony confirming that he went to Sequoia National Park and Nevada with Doe 3 and Los Angeles with Doe 2 corroborated their testimony that the trips occurred and that defendant was with them on specific occasions. Such argument was a fair comment on the evidence and did not constitute misconduct.

**III. The Court Did Not Prejudicially Err in Failing to Instruct the Jury With CALCRIM No. 1191A**

Defendant next contends the court erred in failing to sua sponte instruct the jury with CALCRIM No. 1191A, which limits the jury's consideration of uncharged offenses. The court did not prejudicially err.

**A. Relevant Procedural History**

Before trial, the prosecutor noted uncharged offenses admitted pursuant to Evidence Code sections 1101, subdivision (b), and 1108 are not subject to the proof beyond a reasonable doubt standard, but rather a preponderance of the evidence standard. However, the prosecutor asked the court to instruct the jury only with the higher, proof beyond a reasonable doubt standard, even regarding the propensity evidence.

During her CART interviews and at trial, Doe 3 discussed certain acts of abuse occurring on a trip with defendant to Nevada and on the way to Sequoia National Park. And Doe 2 testified defendant touched her inappropriately on a trip back from Los Angeles.

In summation, the prosecutor expressly noted defendant was not charged with these specific incidents. She explained the Sequoia National Park incident was not charged because it "could be Fresno, could be Tulare County. We have jurisdiction here." Similarly, she reminded the jury, "that Nevada incident is not charged because, again, it happened in Nevada. We're in the State of California." Likewise, she stated because Doe 2 could not give a specific location regarding the touching that took place near an off-ramp, and it was unclear whether the incident occurred in Tulare, Kern, or Los Angeles County, this incident was not charged in this case. Accordingly, the jury could not convict defendant of that charge. The prosecutor further explained the trips to Nevada, Los Angeles, and to the Sequoias could be used "to decide if the defendant was inclined or disposed to commit the other crimes that happened in our jurisdiction."

## B.       Standard of Review and Applicable Law

"[E]vidence of a defendant's other sex offenses constitutes relevant circumstantial evidence that he committed the charged sex offenses.  A properly instructed jury will … be given the usual instructions regarding the presumption of defendant's innocence and the prosecutor's proof burden.  Additionally …, at the defendant's request, the jury may be told that evidence of his other sexual offenses is not sufficient by itself to prove his commission of the charged offense, that the weight and significance of the evidence, if any, is for the jury to decide, and that unless otherwise instructed, the jury may not consider this evidence for any other purpose." (*People v. Falsetta* (1999) 21 Cal.4th 903, 920.)

CALCRIM No. 1191A instructs the jury on the consideration of uncharged sex offenses and provides:

"The People presented evidence that the defendant committed the crime[s] of _____*<insert description of offense[s]>* that (was/were) not charged in this case.  (This/These) crime[s] (is/are) defined for you in these instructions.

"You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offense[s].  Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt.  A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden of proof, you must disregard this evidence entirely.

"If you decide that the defendant committed the uncharged offense[s], you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit [and did commit] _____*<insert charged sex offense[s]>*, as charged here.  If you conclude that the defendant committed the uncharged offense[s], that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is

guilty of _____<insert charged sex offense[s]>.  The People must still prove (the/each) (charge/ [and] allegation) beyond a reasonable doubt.

"[Do not consider this evidence for any other purpose [except for the limited purpose of *<insert other permitted purpose, e.g., determining the defendant's credibility>* _____].]"

Ordinarily, the court does not have a sua sponte duty to instruct the jury with CALCRIM No. 1191A.  (*People v. Cottone* (2013) 57 Cal.4th 269, 293, fn. 15; see *People v. Falsetta, supra*, 21 Cal.4th at p. 924 ["the trial court ordinarily has no sua sponte duty to instruct the jury as to the admissibility or use of other crimes evidence"].)

## C.    Analysis

Defendant argues the court erred in failing to instruct the jury with CALCRIM No. 1191A, which left the jury free to convict defendant based on uncharged acts that were not shown to have occurred in Tulare County, the jurisdiction of the court.  He contends his convictions must be reversed because "it is impossible to tell whether the jury's verdicts rest upon legally adequate grounds or inadequate grounds."  In his reply brief, defendant concedes the trial court does not have a sua sponte duty to instruct the jury with CALCRIM No. 1191A; but he argues for the first time, if this issue is waived based on his counsel's failure to request such an instruction, his counsel was ineffective. The People, too, note the trial court had no sua sponte duty to instruct the jury with CALCRIM No. 1191A and, irrespective, any alleged error was harmless because overwhelming evidence supports defendant's convictions.

As the parties acknowledge, the trial court had no sua sponte duty to instruct the jury with CALCRIM No. 1191A, and defendant never requested such an instruction. (See *People v. Cottone, supra*, 57 Cal.4th at p. 293, fn. 15; see also *People v. Falsetta, supra*, 21 Cal.4th at p. 924.)  However, even assuming, arguendo, the issue was sufficiently preserved for our review, any alleged error in failing to instruct the jury on how to use the propensity evidence was harmless.

Here, the prosecutor explicitly informed the jury the alleged incidents that occurred outside of Tulare County were not charged in this case, and defendant could not be convicted based on those incidents. Indeed, the prosecutor expressly clarified the defendant was not charged with putting his finger inside Doe 3's vagina on the trip to Nevada; rather, Doe 3 said it happened at least 10 times and defendant was only charged in three counts. Similarly, the prosecutor noted defendant was not charged with touching Doe 3's hand to his penis on the trip to Sequoia National Park; rather, Doe 3's other testimony provided a basis for the charged offenses. Additionally, the jury was instructed the prosecutor had the burden of proving each charge and allegation beyond a reasonable doubt. Neither party argued to the jury that they should convict defendant based on the uncharged incidents that occurred outside of Tulare County. And the uncharged crimes were no more inflammatory than the charged crimes, which were supported by substantial evidence as discussed further. On this record, we conclude any alleged error in failing to instruct the jury with CALCRIM No. 1191A was harmless. (See *People v. Falsetta*, *supra*, 21 Cal.4th at pp. 924–925; see generally *People v. Watson* (1956) 46 Cal.2d 818, 838.)

## IV. Sufficiency of the Evidence

Finally, defendant argues there is insufficient evidence to support his convictions. We reject defendant's challenges and affirm each of his convictions.

### A. Standard of Review

On appeal, the relevant inquiry governing a challenge to the sufficiency of the evidence "'is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.) The reviewing court's task is to review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—evidence that is

reasonable, credible, and of solid value upon which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  (*People v. Bolin* (1998) 18 Cal.4th 297, 331; *People v. Johnson* (1980) 26 Cal.3d 557, 578.)

We "presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence."  (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)  "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis … is there sufficient substantial evidence to support"' the jury's verdict."  (*Ibid*.)

"In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts.  [Citation.]  Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact.  [Citation.]  Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.  [Citation.]"  (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

> """"[A]lthough an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category.  [Citation.]  To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions.  [Citations.]  Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.'""""  (*People v. Dalton* (2019) 7 Cal.5th 166, 209.)

## B.    Applicable Law

Generic testimony regarding molestations may be sufficiently substantial from an evidentiary standpoint.  (See *People v. Jones* (1990) 51 Cal.3d 294, 314–316.)  "[E]ven generic testimony (e.g., an act of intercourse 'once a month for three years') outlines a

series of *specific*, albeit undifferentiated, incidents, *each* of which amounts to a separate offense, and *each* of which could support a separate criminal sanction." (*Id*. at p. 314.) And "the particular details surrounding a child molestation charge are not elements of the offense and are unnecessary to sustain a conviction." (*Id.* at p. 315.)

> "The victim … must describe the *kind of act or acts committed* with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct (e.g., lewd conduct, intercourse, oral copulation or sodomy). Moreover, the victim must describe the *number of acts* committed with sufficient certainty to support each of the counts alleged in the information or indictment (e.g., 'twice a month' or 'every time we went camping'). Finally, the victim must be able to describe *the general time period* in which these acts occurred (e.g., 'the summer before my fourth grade,' or 'during each Sunday morning after he came to live with us'), to assure the acts were committed within the applicable limitation period. Additional details regarding the time, place or circumstance of the various assaults may assist in assessing the credibility or substantiality of the victim's testimony, but are not essential to sustain a conviction." (*People v. Jones*, *supra*, 51 Cal.3d at p. 316.)

## C. Analysis

Defendant challenges the sufficiency of the evidence in support of each of his convictions. We reject defendant's assertions.

### 1. *Counts 1–41 committed against Doe 3*

With regard to the counts committed against Doe 3, defendant argues Doe 3's testimony was inherently improbable or physically impossible and should be discredited because her allegations changed over time and she continued to visit defendant and his wife despite the alleged abuse. He contends he "could not have been driving around with [Doe 3] in his truck assaulting her on a daily basis because she was in school nine months of the year." He further asserts there was evidence "the molestation allegations were very likely orchestrated by [defendant's wife] for financial gain." The People respond the record contains overwhelming evidence supporting these counts. Relying on *People v. Jones*, *supra*, 51 Cal.3d 294, the People argue cases involving a resident child molester

often involve victims who testify to repeated acts of molestation over an extended period of time may lack details, dates, or distinguishing characteristics as to individual acts of abuse. They assert Doe 3 credibly explained she became more comfortable discussing the full extent of the molestations over time and after going to therapy. Additionally, the jury considered and rejected defendant's arguments there was no physical evidence of assault, that defendant's wife orchestrated the allegations for her own financial gain, and that evidence the girls enjoyed visiting defendant's house undermined their allegations. We agree with the People.

As detailed *post*, our review of the record establishes substantial evidence supports defendant's convictions against Doe 3. That Doe 3's allegations grew and evolved over time does not affect our conclusion. "[I]t is the exclusive province of the trial judge or jury to determine the credibility of a witness." (*People v. Jones*, *supra*, 51 Cal.3d at p. 314.) And, here, the jury was made aware of the discrepancies in Doe 3's various accounts and nonetheless found her allegations to be credible. They were also presented with the defense theory that defendant's wife orchestrated the allegations, but presumably rejected this defense in convicting defendant of the charged crimes. There was nothing inherently implausible about Doe 3's testimony, and nothing in the evidence establishes defendant's acts were physically impossible. The jury could have reasonably rejected defendant's theory of the case and instead accepted Doe 3's allegations. And, as further detailed, our review of the record establishes substantial evidence supports defendant's convictions.

### (a) Counts 1–3: Sexual intercourse with a child 10 years of age or younger

First, substantial evidence supports the jury's verdicts on counts 1, 2, and 3 for sexual intercourse with a child 10 years old or younger in violation of Penal Code section 288.7, subdivision (a). Here, multiple witnesses including defendant testified Doe 3 would regularly spend time at defendant's place of business and house, and Doe 3 spent

48.

substantial time alone with him. During her second CART interview, Doe 3 disclosed defendant had put his penis "inside the line" of her vagina. At trial, Doe 3 again stated defendant put his penis inside the line of her vagina, and this occurred at least three times.

There was nothing inherently improbable or unbelievable about Doe 3's statements. (See *People v. Dalton*, *supra*, 7 Cal.5th at p. 209 ["""Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends"""].) Though defendant denied Doe 3's allegations, the jury accepted Doe 3's version of the events and "it is not a proper appellate function to reassess the credibility of the witnesses." (*People v. Jones*, *supra*, 51 Cal.3d at pp. 314–315.) Accordingly, we conclude sufficient evidence supports defendant's convictions of counts 1, 2, and 3. (See *id.* at p. 316 [concluding where victim specifies type of conduct involved and its frequency and that such conduct occurred during limitation period, "[n]othing more is required"].)

### (b) Counts 4–12: Oral copulation/sexual penetration with child under 10

We next conclude substantial evidence supports defendant's convictions on counts 4–12 for oral copulation/sexual penetration with a child under 10 in violation of Penal Code section 288.7, subdivision (b).

In counts 4–6, defendant was convicted of orally copulating Doe 3 when she was 10 years old or younger. During her second CART interview, Doe 3 reported defendant would push his face into her private area, and he would put his tongue inside her "private." At trial, she testified defendant put his mouth on her vagina more than three times. She described a particular incident to Detective Cotton when she was at the shop with defendant and his wife, and defendant's wife left to go to the store. After she left,

49.

defendant pulled down Doe 3's pants and underwear, resulting in scratches on her legs. Defendant then licked Doe 3's vagina.

Defendant was convicted in counts 7–9 of having Doe 3 orally copulate him. Doe 3 testified defendant put his penis in her mouth more than three times. During one of her CART interviews, Doe 3 recalled defendant tried to force his penis into her mouth and to make her eat the "stuff" that came out of it. Doe 3 told Detective Cotton her mouth was on defendant's penis at the shop at least three times while defendant moved his lower body back and forth. Doe 3 reported to Detective Cotton that defendant would grab her by her head and force her mouth on it; one time, Doe 3 bit defendant and he got upset and did not speak to her for the rest of the day.

And in counts 10–12, defendant was convicted of digitally penetrating Doe 3. During both CART interviews, Doe 3 reported defendant had put his fingers inside her vagina. At trial, Doe 3 again repeated this allegation, stating defendant put his fingers inside her vagina more than three times and moved them up and down. She testified this occurred "almost every day," when they were either at his house or at the shop.

Again, defendant denied all of Doe 3's allegations regarding the inappropriate touching related to these counts. But the jury resolved the conflict in the evidence in favor of Doe 3 and found her account to be more credible. As discussed, "'[w]e do not reweigh evidence or reevaluate a witness's credibility.'" (*People v. Brown* (2014) 59 Cal.4th 86, 106.) And again, we cannot conclude the presented evidence of these counts was inherently improbable or physically impossible. Rather, substantial evidence supports these convictions.

### (c) Counts 13–41: Forcible lewd act upon a child (Doe 3)

We also conclude sufficient evidence supports defendant's convictions for the remaining counts committed against Doe 3, counts 13–41, for forcible lewd acts upon a

child in violation of Penal Code section 288, subdivision (b). We discuss each of defendant's related convictions and the supporting evidence admitted at trial in turn.

In counts 13–15 defendant was convicted of touching his penis to Doe 3's vagina. During her second CART interview and at trial, Doe 3 could not recall exactly how many times this happened, but, both times, she reported this occurred "a lot."[1] Doe 3 described specific incidents during her CART interview. She explained that when she was at the shop with defendant, he would make her sit on his lap facing towards him with her legs wrapped around his back and his penis would touch her vagina. She also described a time when this occurred before defendant rolled her over and "stuff" came out on her back.

In count 16 defendant was convicted of touching his penis to Doe 3's buttocks. Both at trial and during her second CART interview, Doe 3 explained defendant touched his penis to her buttocks and it was uncomfortable and painful. During her CART interview, she explained this happened once or twice; she recalled that she said "no," but defendant held her down. At trial, Doe 3 stated this type of touching occurred more than three times.

In counts 17–19, defendant was convicted of putting his penis on Doe 3's stomach. Doe 3 testified this occurred on more than three occasions. During a CART interview, Doe 3 specifically recalled white stuff coming out of defendant's penis onto her stomach.

In count 20, defendant was convicted of putting his hand to Doe 3's vagina in the car. At trial and during a CART interview, Doe 3 discussed a specific incident when defendant touched her "private part" over her clothes in the car on the way home from

---

[1]It bears noting Doe 3 also testified at trial that defendant's front middle part touched her front middle part "not often," "[m]ore like twice."

51.

dropping off defendant's wife at the airport. Doe 3 asked defendant to take her home because she felt uncomfortable.

In counts 21–23 defendant was convicted of putting his hand to Doe 3's vagina while they were at the shop, defendant's place of business. Doe 3 testified defendant touched her private with his fingers and hand at least five times when they were at the shop. She recalled sitting on defendant's lap at the computer and defendant would "reach over and try to touch [her] privates." People would be around but defendant "tried to be sneaky about it." She described a specific incident when defendant rubbed her private part in the office while his wife took out the trash.

In counts 24–26, defendant was convicted of touching his hand to Doe 3's vagina at his house. Doe 3 testified defendant touched her vagina with his hands more than five times in his bedroom when his wife was not home, or she was in the shower. She also recalled him touching her private at the shop behind his house. At trial and during a CART interview, Doe 3 recalled a specific incident when defendant touched her private under her bathing suit while his wife went to get a towel.

In counts 27–29, defendant was convicted of putting his mouth to Doe 3's breasts. Doe 3 testified defendant put his mouth to her breast more than five times. During her CART interview, she explained defendant would comment that her breasts were getting large, squeeze them, and put his mouth on them.

In counts 30–32, defendant was convicted of putting his hand to Doe 3's breast. Doe 3 testified defendant touched her breasts with his hands more than five times. During her CART interview, Doe 3 explained she would sleep in a big T-shirt and defendant would touch her breasts under her shirt.

In counts 33–35, defendant was convicted of touching Doe 3's buttocks with his hand. At trial, Doe 3 testified defendant would touch her buttocks with his hands "a lot" and that he squeezed her "butt" more than five times.

52.

In counts 36–39 defendant was convicted of kissing Doe 3. Ms. M. and Doe 2 testified they saw defendant kiss Doe 3 on the lips. And at trial and during her CART interviews, Doe 3 reported defendant would regularly kiss her on the lips when he dropped her off; he did it more than 10 times.

In counts 39–41, defendant was convicted of putting Doe 3's hand to his penis. Doe 3 reported in her CART interview and testified at trial that defendant forced her to touch his genital area by grabbing her hand and putting it on his "private." She reported to Detective Cotton this occurred three to four times; defendant would unzip his pants and her hand would touch his penis through the zipper.[2] Doe 3 testified she specifically recalled defendant forcing her hand to his "private part" the day before she disclosed the molest in February 2016.

Again, defendant denied all of the charges, and Doe 3 did not initially disclose all of the incidents of molest. However, as detailed, Doe 3 did eventually report each of the charged incidents of molest and the jury credited her reports in convicting defendant of the charges. There was nothing inherently improbable or impossible about Doe 3's allegations. And we reject defendant's challenge to his convictions based not on an absence of substantial evidence, but rather on challenges to the credibility of, and supposed inconsistencies in Doe 3's testimony. (*People v. Young*, *supra*, 34 Cal.4th at p. 1181 [appellate court will not address sufficiency-of-the-evidence challenges by assessing credibility issues or weighing evidentiary conflicts]; *People v. Mayberry* (1975) 15 Cal.3d 143, 150 [evidentiary "'"[c]onflicts and even testimony which is subject to justifiable suspicion"'" are not grounds for reversal, since credibility matters are the "'"exclusive province of the trial judge or jury"'"].) Rather, we conclude substantial evidence supports defendant's convictions of counts 13–41.

---

[2]At trial, Doe 3 initially did not recall defendant's "private part" touching her hand, but later reported this occurred. In her CART interview, Doe 3 reported this occurred two times, once during the uncharged incident to Sequoia National Park.

### 2. *Counts 46, 52, and 53 committed against Doe 1 and Doe 2*

Defendant also challenges his convictions for acts against Doe 1 and Doe 2. We address and reject each of defendant's challenges in turn.

#### (a) Counts 46: Lewd act upon a child (Doe 2) and Count 53: Using a minor for sex acts (Doe 1)

Defendant asserts insufficient evidence supports his convictions for counts 46 and 53—committing a lewd act upon a child (Doe 2) in violation of Penal Code section 288, subdivision (a) and using a minor (Doe 1) for sex acts in violation of section 311.4, respectively—in connection with an incident in his shop when he had Doe 1 photograph Doe 2 using a vibrator on her vagina. He asserts Doe 2 and Doe 1 told "wildly different stories about the incident in the shop" and their testimony was "inherently improbable or physically impossible." Doe 2 stated she was asked to remove all her clothes; whereas, Doe 1 recalled Doe 2 only pulling down her pants. Doe 2 did not remember what the vibrator felt like, which defendant contends she "would certainly remember." Doe 1 testified she was sitting on the couch with defendant's wife before going to the shop, but Doe 2 denied that she was in the shop with defendant before Doe 1 arrived. Doe 2 thought defendant's flip phone was black while Doe 1 thought it was blue. Defendant further asserts "[a] vibrator in a [minor]'s vagina would have produced injury and bleeding." The People respond defendant's arguments on appeal are nothing other than an attack on witness credibility, and the proffered evidence was not inherently improbable. We agree with the People.

Substantial evidence supports defendant's convictions for counts 46 and 53. At trial, both Doe 1 and Doe 2 testified regarding the charged misconduct. Doe 1 testified she recalled an incident that occurred in the shop behind defendant's house with Doe 2 and defendant. Defendant pulled out a piece of carpet and put it on top of an orange lift. The People introduced a photograph of an orange-colored hydraulic lift that is inside the shop area of defendant's residence. According to Doe 1, defendant told Doe 2 to take off

her pants and lie down on the carpet. He handed Doe 2 a pinkish vibrator and told her to put it in her vagina. He told Doe 1 to use his blue flip phone to take photographs of Doe 2's vagina while Doe 2 inserted the vibrator in her vagina.

Doe 2 also testified regarding the incident. She explained she went to the shop behind defendant's house with defendant and Doe 1. Doe 2 testified she took off her clothes and sat down on an orange lift at defendant's direction. Defendant then handed her a pink vibrator and had her put it in her vagina. He handed Doe 1 his flip phone and told her to take pictures of Doe 2 putting the vibrator in her vagina. Doe 2 initially testified the flip phone was black, but she later confirmed it was dark blue.

This testimony provided substantial evidence—evidence that was reasonable, credible, and of solid value, upon which a reasonable trier of fact could find defendant guilty beyond a reasonable doubt—of counts 46 and 53. (See *People v. Bolin*, *supra*, 18 Cal.4th at p. 331.) To the extent there were minor inconsistencies regarding the details of the circumstances surrounding the incident, "[r]esolution of … inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young*, *supra*, 34 Cal.4th at p. 1181.) Additionally, contrary to defendant's assertion, there is no evidence it was inherently improbable or physically impossible that the incident testified to by Doe 2 and Doe 1 occurred and it did not result in substantial physical injury to Doe 2. Rather, substantial evidence supports defendant's convictions of counts 46 and 53. (See *People v. Austin* (1980) 111 Cal.App.3d 110, 115, see *id*. at pp. 114–116 [defendant who ordered child to remove her own pants was liable for commission of lewd act against the child; defendant "was responsible for the touching and removal of the child's pants as surely as if he had done it himself"].)

### (b) Count 52: Lewd act upon a child (Doe 2)

Defendant next argues there was "no evidence" to support count 52, which related to defendant touching Doe 2's thigh in violation of Penal Code section 288, subdivision

(a).  He argues the evidence is insufficient to sustain this conviction because Doe 1 did not report the incident to law enforcement and Doe 2 testified Doe 1 was not in the truck when the touching occurred.

However, Doe 2 expressly testified that, more than once, defendant rubbed her thigh with his hand.  Doe 1 testified she saw defendant touch Doe 2's thighs over her clothes while in his truck when they would go to the store.  Though Doe 2 did not remember defendant touching her thigh while Doe 1 was in the vehicle, she did not testify this did not occur.  Both Doe 2's and Doe 1's testimonies provided substantial evidence in support of defendant's conviction of count 52.

On this record, we reject all of defendant's challenges to the sufficiency of the evidence in support of his convictions.

## DISPOSITION

The judgment is affirmed.

PEÑA, J.

WE CONCUR:

FRANSON, Acting P.J.

SNAUFFER, J.